UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MARVEL ANTIONETTE PRUITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:17 CV 2463 RWS |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Deputy Commissioner of Operations, | ) | |
| Social Security Administration | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

Marvel Pruitt brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's decision denying her application for supplemental security income. Because the Commissioner's decision is supported by substantial evidence on the record as a whole, I will affirm the Commissioner's decision.

### BACKGROUND

On April 11, 2014, Pruitt filed an application for supplemental security income pursuant to 42 U.S.C. § 1382. (Id.). Pruitt documents that she suffered from numbness in her hands and limbs derived in part from diagnosed multiple sclerosis, as well as pain, limited mobility, and related health challenges. She

alleges that she became disabled within the meaning of 42 U.S.C. § 1382, by December 1, 2009, her alleged onset date. (Id.); see also Tr. 160 (portion of Pruitt's work history report identifying circumstances of incident). She later amended her initial onset date to March 10, 2014. (Tr. 129). Pruitt's application was denied on initial consideration. (Tr. 64). She requested a hearing before an Administrative Law Judge (ALJ). (Tr. 69). Pruitt, accompanied by counsel, attended the hearing on February 18, 2016. (Tr. 34-50). The ALJ issued a decision denying Pruitt's application on July 19, 2016. (Tr. 17-28). On July 27, 2017, the Appeals Council denied Pruitt's request for review. (Tr. 1).

Pruitt filed the present appeal for judicial review, arguing that: 1) the ALJ erroneously relied on an improper "overwhelming fatigue" standard when he determined Pruitt's impairments did not meet listed impairment 11.09; and 2) the ALJ did not rely on medical evidence when concluding that Pruitt's residual functional capacity (RFC) enabled her to work sedentary jobs where no handling or filing of papers was required.

**Administrative Record**

The Commissioner accepts Pruitt's Statement of Uncontroverted Facts, (Doc. 19), with three clarifications.[1] (Doc. 24-1). I will adopt those facts in Pruitt's Statement of Uncontroverted Facts that the Commissioner does not challenge. I

---

[1] The Commissioner clarifies (1) that the medical records cited in ¶ 11 are from multiple office visits, (2) that Pruitt's facial numbness and right leg and sleep disturbances were symptoms reported by Pruitt and not medical findings, and (3) that the event referenced in ¶ 16 was a brief, outpatient visit.

also adopt the Commissioner's Statement of Additional Facts (Doc. 24-2) as uncontroverted by Pruitt.

**ALJ Decision**

In its July 19, 2016, decision, the ALJ found that Pruitt had not engaged in substantial gainful activity after her amended alleged onset date of March 10, 2014. (Tr. 22). He also found that Pruitt suffers from the following severe impairments: "multiple sclerosis, morbid obesity, degenerative disc disease[,] and depression." (Id.). However, the ALJ found that this combination of severe impairments did not equate to one of the listings provided in 20 CFR 404, Subpt. P, App. 1. (Id.).

After evaluating Pruitt's claims, the medical opinion evidence, and the medical evidence of record, the ALJ determined that Pruitt retained the residual functioning capacity (RFC) to:

> [Perform] sedentary work as defined in 20 CFR 416.967(a) except she is unable to climb a [sic] ladders, ropes or scaffolds, but she can occasionally climb ramps and stairs, stoop, kneel, crouch and crawl. She is unable to reach in all directions bilaterally on more than an occasional basis. She is to avoid concentrated exposure to extreme humidity, cold and heat. She is to avoid extreme vibration, all operational control of moving machinery, working at unprotected heights and the use of hazardous machinery. She is to avoid concentrated exposure to irritants such as fumes, odors, dust, gases and poorly ventilated areas. She is unable to sort, handle or use paper files. She is limited to occupations that involve only simple, routine and repetitive tasks in a low-stress

3

> job defined as requiring only occasional decisionmaking
> and only occasional changes in the work setting.

(Tr. 23). Based on this RFC determination, the ALJ found that Pruitt was no longer able to perform her past relevant work. (Tr. 27). The ALJ consulted a vocational expert (VE) to assess whether jobs within Pruitt's RFC existed in significant numbers in the national economy. (Id.); see also Tr. 259-260 (VE's report). The VE identified the jobs of food & beverage order clerk and telephone solicitor; he further identified these jobs as sedentary unskilled work within Pruitt's RFC. Finally, the VE identified 70,000 food & beverage order clerk jobs and 200,000 telephone solicitor jobs in the national economy. (Tr. 28). The ALJ therefore determined that Pruitt was not disabled within the meaning of the Social Security Act. (Id.).

**LEGAL STANDARD**

To be eligible for supplemental security income under the Social Security Act, Pruitt must prove that she is disabled. 42 U.S.C. § 1382(a)(1); see also Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [her] physical or

mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether the claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If the claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

I must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). Determining whether there is substantial evidence requires a scrutinizing analysis. Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007).

I must consider evidence that supports the Commissioner's decision as well as any evidence that fairly detracts from the decision. McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010). If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision. Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012). I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. McNamara, 590 F.3d at 610.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's

6

subjective complaints when they are inconsistent with the record as a whole. See, e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> [The] claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

Id. at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding. Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002).

**ANALYSIS**

**A. The ALJ properly evaluated the severity of plaintiff's impairments and determined that they did not equal those identified in the listings.**

The ALJ identified Pruitt's severe impairments as "multiple sclerosis, morbid obesity, degenerative disc disease and depression[.]" (Tr. 22). The Social Security impairment listing for multiple sclerosis is found at listing 11.09 in the subset of Neurological Disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A2.

7

When evaluating if Pruitt is disabled, the ALJ "considered listing 11.09 and the other medical listings" and "determined that [Pruitt] does not meet or medically equal the applicable criteria for any listed physical impairments." (Tr. 22).

To equal the severity of listing 11.09, a plaintiff's case of multiple sclerosis must be characterized by:

> A. Disorganization of motor function as described in 11.04B; or
>
> B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or
>
> C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A2, (effective August 12, 2015 to May 23, 2016).[2] The listing for 11.04B referenced above reads as follows:

> B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

---

[2] Because Dr. Genest issued his opinion on March 1, 2016, this version of the listings is applicable to Pruitt's claim. See Tr. 523. Subsequent citations to the regulations are likewise made to the version of the listings applicable at the time. See, e.g., Rucker for Rucker v. Apfel, 141 F.3d 1256, 1259 (8th Cir. 1998) (evaluating an ALJ's decision by "the standards applicable at the time of the ALJ's decision."); Muncy v. Apfel, 247 F.3d 728, n.2 (8th Cir. 2001) (same); Bryant on Behalf of Bryant v. Apfel, 141 F.3d 1249, 1251 (8th Cir. 1998) (same).

Id. Listing 11.00C, in turn, provides:

> C. Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

Id. Stephen Genest, M.D., prepared a report and assessment for the ALJ for use in his opinion. (Tr. 517). Dr. Genest opined that Pruitt "does not meet 11.09 M.S. [multiple sclerosis]" because her "motor formation [is] not disorganized," because she has "no visual or mental impairment," and because she is "fatigued but not overwhelmingly so." (Tr. 525) (underline in original).

Pruitt rejects this conclusion. In her brief, she first argues that Dr. Genest improperly required "overwhelming" fatigue, which is not required by the listing. (Doc. 18 at 16). Second, Pruitt argues that numbness in her hands, which Dr. Genest identified as interfering with her ability to sort, handle, or use paper or files, should also have been evaluated as a musculoskeletal impairment. (Id.). Pruitt argues that her hand numbness should be ultimately dispositive of her case:

> The limitations outlined in [the] report are incompatible with the ability to engage in even unskilled sedentary work… If [Pruitt] is not able to use and sort papers and files and other lighter materials due to hand numbness,

9

> then [she] would be incapable of performing even light work, which would require doing more than occasional reaching, pushing and pulling.

(Id.).

In response, the Commissioner argues that listing 11.09 is the only appropriate listing to apply:

> [The] listing itself dictates that "impairments with neurological causes are to be evaluated under 11.00," and indeed, there is a specific listing for MS…. Moreover, the subparagraph [on musculoskeletal impairment] to which [Pruitt] refers, § 1.00(B)(2)(c), addresses "extreme loss of function of both upper extremities" which interferes very seriously with an individual's ability to independently perform activities. This description does not apply to [Pruitt], who was able to mow the lawn, drive, and type, among other things (Tr. 160-62, 181).

(Doc. 24 at 4). The Commissioner further argues that:

> [The] record contains sparse evidence of limitation related to MS…. The ALJ determined that [Pruitt] did not meet Listing 11.09 (Tr. 21)…. With respect to the subparts of the listing, there is no evidence of motor dysfunction…. (Tr. 373, 439, 446, 450, 456, 469)…. Plaintiff routinely denied vision problems (Tr. 355, 363, 371, 377, 379). Plaintiff also denied weakness… demonstrated normal muscle strength and tone, and was apparently able to engage in repetitive activity such as riding a bike (Tr. 196, 371, 438, 439, 468, 469). [Pruitt] does not meet Listing 11.09 regardless of the [language] the medical expert used. Dr. Genest's use of the phrase "not overwhelmingly so" is of no consequence.

(Doc. 24 at 5-6).

Following my careful review of the parties' briefs, the ALJ's decision, and the underlying record, I make the following conclusions.

First, the ALJ had substantial evidence to conclude that Pruitt does not meet the criteria for listing 11.09. The record extensively supports the conclusion that Pruitt's symptoms did not include motor dysfunction, loss of vision, or "significant, reproducible" fatigue within the meaning of listing 11.09. Specifically, doctors' examinations found no symptoms of motor dysfunction in February 2014 and June 2015, (Tr. 373, 446), no vision problems in August 2010 and December 2015, (Tr. 377, 355), and no muscle weakness in February 2014 and December 2015. (Tr. 371, 438). A second examination in December 2015, found "bilateral blurry vision transiently occasionally" which Pruitt manages with medication. (Tr. 438).

Dr. Genest's use of the phrase "not overwhelmingly so" is not disqualifying. With this phrase, Dr. Genest expresses that Pruitt's symptoms did not reach the level of "*significant*, reproducible fatigue of motor function with *substantial* muscle weakness on repetitive activity" required by listing 11.09. 20 C.F.R. Pt. 404, Part A2, Subpt. P, App. 1 (emphasis added). Pruitt's claim that Dr. Genest's turn of phrase implies that he improperly used a standard different from that of the listings is unpersuasive. Dr. Genest's opinion cites to listing 11.09 explicitly

11

delineates his findings by each subsection. These structural choices demonstrate that he used the standards the listing required. (See Tr. 525).

Second, Pruitt's argument that numbness in her hands precludes her from performing even light work is not logically supported by the medical evidence of record. On the same page of his report in which Dr. Genest opined that her hand numbness would impair her ability to handle files, he also stated that Pruitt could "perform activities like shopping," "prepare a simple meal & feed [herself]," and "care for [her] personal hygiene[.]" (Tr. 523). Each of these activities requires the use of the hands to grip and manipulate tools. Pruitt herself testified at the administrative hearing that she has difficulty with "buttons, zippers, [and] coins" and "trouble tying knots," but that she drives herself and folds her laundry. (Tr. 45, 47-48). As a result, there is substantial evidence supporting the ALJ's determination that the numbness in Pruitt's hands does not preclude her from performing sedentary work.

Pruitt's suggestion that her hand numbness should also be evaluated under the criteria for musculoskeletal impairment is unpersuasive. Multiple sclerosis is a neurological disorder, the criteria for which are specifically addressed in the regulations under listing 11.09. See 20 C.F.R. Pt. 404, Part A2, Subpt. P, App. 1. The medical record supports the ALJ's inference that MS is the source of Pruitt's hand numbness. See Tr. 24-26. Even assuming that Pruitt's hand numbness

should be considered under musculoskeletal impairment, Pruitt does not provide evidence satisfying the criteria for those listings.

The closest listing for musculoskeletal impairment is 1.02.B:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
> . . .
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. § Pt. 404, Subpt. P, App. 1

Pruitt may satisfy the "inability to perform fine . . . movements" criteria, because the ALJ found that her hand numbness would interfere with sorting and handling papers or files. § Pt. 404, Subpt. P, App., 1.00B2c. However, she can perform "gross" movements, e.g., preparing a meal. Further, hand joints do not constitute "major peripheral joints," § Pt. 404, Subpt. P, App. 1, 1.00F, and Pruitt does not demonstrate that she meets the other requirements of musculoskeletal impairment, including diagnosis, evaluation, and documentation. § Pt. 404, Subpt. P, App. 1, 1.00E, H. As a result, the ALJ's decision not to apply the musculoskeletal listings is supported by substantial evidence.

**B. The ALJ's determination of plaintiff's RFC was supported by the medical evidence of record.**

Pruitt cites Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), and Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001), for the proposition that the determination of a plaintiff's RFC is ultimately a medical question. The record must therefore include some medical evidence that supports the RFC. Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (internal citation omitted). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016).

First, Pruitt reiterates her argument that because she is "incapable of handling papers and files[,]" the ALJ's decision "fails to articulate a legally significant rationale as to why this restriction does not reasonably lead to the conclusion [that Pruitt] would be incapable of engaging in work-related activity." (Doc. 18 at 20).

Second, Pruitt claims that the ALJ improperly evaluated the opinion of treating physician Patrick Hogan, M.D. (Id.). According to Pruitt, Dr. Hogan "indicated [she] had a somatic condition." (Id. at 20). Dr. Genest concluded that Dr. Hogan's opinion on this point was incorrect. (Id. at 21). Pruitt argues that Dr. Genest "did not offer a legally sufficient rationale outlining why Dr. Hogan's medical opinion was in fact incorrect." (Id. at 21). On this basis, she argues that

14

the ALJ's decision, in adopting the conclusions of Dr. Genest, "did not properly consider all the medically determinable impairments in this matter." (Id. at 21).

Finally, Pruitt argues that the ALJ improperly evaluated her credibility, and therefore her subjective statements, in light of her activities of daily living. (Doc. 18 at 21-23). Pruitt claims that her case is analogous to Burress v. Apfel, 141 F.3d 875 (8th Cir. 1998), and to Baumgarten v. Chater, 75 F.3d 366 (8th Cir. 2000). Pruitt argues that she "need not prove that her pain precludes all productive activity and confines her life to in [sic] front of the television." (Doc. 18 at 22) (citing Baumgarten, 75 F.3d at 369).

In response, the Commissioner first argues that it "is [Pruitt's] burden to establish that her severe impairments cause disabling limitations. . . . the record here establishes a mild case of MS that causes some limitation, but does not limit [her] to the extent alleged." (Doc. 24 at 8). Responding to Pruitt's claim that her inability to handle paper files should be dispositive, the Commissioner argues that:

> Dr. Genest [also] opined that [Pruitt] could lift and carry up to 20 pounds, the equivalent of light work (Tr. 518). … If an individual can perform light work, she can necessarily also perform sedentary work, so [Pruitt's] conclusion that Dr. Genest's opinion is inconsistent with even sedentary work is simply incorrect.

(Doc. 24 at 8-9).

Second, the Commissioner disputes Pruitt's characterization of Dr. Hogan's opinion regarding any somatic disorder:

> Dr. Hogan noted that [Pruitt's] symptoms were compatible with somatic fixation disorder (Tr. 292).... The ALJ found that Dr. Hogan's observations of [Pruitt's] functioning were consistent with the record and her self-described functioning... [and] actually gave Dr. Hogan's observations significant weight because they were consistent with the record (Tr. 24-25).... To the extent the ALJ did not adopt Dr. Hogan's question of the etiology of symptoms, it is because objective evidence established [MS instead].

(Doc. 24 at 9-10) (emphasis in original).

Finally, in responding to Pruitt's claim that the ALJ improperly evaluated her credibility, the Commissioner explained the ALJ's reasoning at length. The ALJ noted some observations consistent with her claims, and others inconsistent with her claims:

> While [Pruitt] testified that she sometimes lacked the use of her hands, she had normal grip strength, and maintained sufficient use of her hands to do things like drive, dust, mow the lawn, and type (Tr. 42, 45, 160-62, 295). She wore gloves to the hearing and to the consultative examination, but no other provider noted that she wore gloves (Tr. 42, 292). [Pruitt] also exercised regularly which indicates that she is not as limited as alleged. (Tr. 196, 438, 445). She appears to have been able to fill out forms without significant difficulty, although she indicated her daughter helped with one form (Tr. 174-79, 180-82). . . .
>
> . . . [Pruitt's] work history also erodes her disability claim. She stopped working at the end of 2004, five years before her injury and nearly 10 years before she applied for disability (Tr. 25, 125, 160). . . . [S]he has acknowledged that she did not stop working because of disability (Tr. 241, 135, 159).

(Doc. 24 at 7-8).

Having carefully considered the parties' briefs, the ALJ's decision, and the underlying evidence in the record, I hereby make the following conclusions.

First, and as discussed previously in the disposition of her first claim, Pruitt's hand numbness does not, on its own, prove that she is incapable of performing any work. The ALJ had substantial evidence to reach the conclusion that Pruitt had some residual functional capacity to perform work. Specifically, the ALJ relied on testimony from a vocational expert "based on a properly phrased hypothetical question." Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (internal citation omitted); see also Milam v. Colvin, 794 F.3d 978, 985-986 (8th Cir. 2015). The ALJ properly phrased his hypothetical question, incorporating Pruitt's physical inability to "sort, handle or use paper/files" based on the medical evidence in the record as a whole. (Tr. 255). Relying on the ALJ's hypothetical, the vocational expert identified suitable jobs within Pruitt's RFC. (Tr. 259-260).

Second, the ALJ properly considered Dr. Hogan's opinion. The ALJ noted that "Dr. Hogan's observations are afforded significant weight in this decision because they are consistent with the claimant's self-reported level of function." (Tr. 25). The ALJ ultimately found that "the objective findings do show some neurological abnormalities in [Pruitt's] brain indicating intermittent symptoms consistent with MS[.]" (Tr. 25).

Dr. Hogan evaluated Pruitt in June 2014. (Tr. 291). He opined that she had "symptoms compatible with somatic fixation disorder." (Tr. 292). There is no evidence in the record of any follow-up with Dr. Hogan, nor of any other physician's consultation identifying somatic fixation disorder as a possible source of Pruitt's symptoms. Dr. Hogan's report includes a claim that "[Pruitt] was once told they suspected multiple sclerosis[,] but they said that diagnosis was not correct. No one knows what's wrong with her." (Tr. 291). This claim is contradicted by the later examinations of multiple physicians who concurred in the diagnosis of MS. See Tr. 464 (August 2014 diagnosis of MS), Tr. 402-403 (results of March 2015 MRI supporting diagnosis of MS), Tr. 450 (December 2015 follow-up examination determining no new symptoms or reason to re-evaluate diagnosis). Pruitt herself testified at the administrative hearing that her symptoms were the result of MS. (Tr. 42). On this record, the ALJ properly relied on substantial evidence supporting the conclusion that Pruitt's symptoms were the result of MS and not a somatic fixation disorder.

Finally, the ALJ properly evaluated Pruitt's subjective complaints and credibility. The ALJ found that Pruitt's subjective complaints were inconsistent with the objective evidence in the record as a whole. As previously discussed, Pruitt's doctors' visits revealed a relatively mild case of MS which responded well to treatment and showed no evidence of progressively worsening. (See, e.g., Tr.

446 (doctor's notes from examination in July 2015 stating that Pruitt's MS "continues to do well and MRI without evidence of progressive disease"); Tr. 438 (six-month follow-up examination in December 2015, reporting no new symptoms)).

Additionally, Pruitt's activities of daily living are distinguishable from and more physically demanding than the "light housework" identified in Baumgarten, 75 F.3d 366, and Burress, 141 F.3d 875. In Baumgarten, the Eighth Circuit noted that because a claimant's few examples of strenuous activity were each separated by several months and immediately followed by a visit to the doctor complaining of pain, "these isolated attempts shed more light on [claimant's] perseverance than on the credibility of her complaints of pain." Id., 75 F.3d at 369. In Burress, the claimant's most physically strenuous activity was "walk[ing] up to one mile on a treadmill." Id., 141 F.3d at 881. Pruitt, by contrast, routinely rides an exercise bike and occasionally operates a lawn mower. (Tr. 445, 174). She reported to a physician as recently as December 2015 that she "exercises 5 days per week." (Tr. 438). She testified at the administrative hearing that the only reason she ceased work was a family emergency, not the result of disability. (Tr. 41).

The ALJ properly determined that Pruitt's impairments did not medically equal the severity of those denominated in the listings. The ALJ also properly evaluated conflicting medical evidence to determine Pruitt's residual functional

capacity, and properly relied on the testimony of the vocational expert in determining that there were jobs within Pruitt's RFC which she could still perform. I therefore find that the ALJ's decision that Pruitt was not disabled within the meaning of the Social Security Act was based upon substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner of Social Security is affirmed.

An appropriate Judgement Order will be issued herewith.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 26th day of March, 2019.